CR-12-08014-PHX-NVW, August 10, 2012

1                    **UNITED STATES DISTRICT COURT**

2                   **FOR THE DISTRICT OF ARIZONA**

3
**United States of America**,              )
4                                          )
                              Plaintiff,   )
5        vs.                               )
                                           )   CR-12-08014-PHX-NVW
6        **Danny Lee Warner, Jr.**,        )
                                           )
7                              Defendant.  )
                                           )   August 10, 2012
8                                          )   4:44 p.m.
_____ )
9

10              **BEFORE:   THE HONORABLE NEIL V. WAKE, JUDGE**

11              **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12                            SENTENCING

13                     A P P E A R A N C E S

14       For the Government:
                 **MICHAEL ALLEN LEE, ESQ.**
15               U.S. Attorney's Office
                 40 North Central Avenue, Suite 1200
16               Phoenix, AZ  85004-4408
                 602.514.7500
17
         For the Defendant:
18               **JANE L. MCCLELLAN, ESQ.**
                 Federal Public Defender (Phoenix)
19               805 West Adams Street, Suite 201
                 Phoenix, AZ  85007
20               602.382.2700/(fax)602.382.2800

21       Official Court Reporter:
         **Elaine Cropper, RDR, CRR, CCP**
22       Sandra Day O'Connor U.S. Courthouse, Suite 312
         401 West Washington Street, Spc. 35
23       Phoenix, Arizona  85003-2151
         (602) 322-7249
24
         Proceedings Reported by Stenographic Court Reporter
25       Transcript Prepared by Computer-Aided Transcription

                   United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1                          **P R O C E E D I N G S**

2           (Court was called to order by the courtroom deputy.)

3           (Proceedings begin at 4:44.)

4           THE COURT:  Please be seated.

5           COURTROOM DEPUTY:  This is criminal case 12-8014,        04:44:47

6    *United States of America v. Danny Lee Warner, Jr.*

7           This is the time set for sentencing.

8           Counsel, please announce.

9           MR. LEE:  Good afternoon, Your Honor.  Michael Lee

10   here on behalf of the United States.                          04:44:56

11          MS. MCCLELLAN:  Good afternoon, Your Honor.  Jane

12   McClellan appearing on behalf of Danny Lee Warner, Jr., who is

13   present and in custody.

14          THE COURT:  All right.  Good afternoon, Counsel.

15          Good afternoon, Mr. Warner.  I apologize to all for     04:45:12

16   being late.  I had a doctor's appointment that I had to tend to

17   and everything went late.

18          But we have all of the time we need for this

19   proceeding.

20          All right.  Mr. Warner, would you please state your     04:45:26

21   full name and date of birth?

22          THE DEFENDANT:  Danny Lee Warner, Jr., November 29,

23   1974.

24          THE COURT:  Let me identify the documents I have.  I

25   have the plea agreement, presentence investigation report, the  04:45:36

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1   sentencing recommendation, and the defendant's objection to the   04:45:41
2   draft presentence report, the defendant's motion for a downward
3   variance and sentencing memorandum, and also attached is the
4   evaluation of Dr. Marc Walter and the government's response to
5   both with various attachments and the defendant's reply.   04:46:03
6        Also, the addendum to the presentence report and a
7   letter from the defendant's stepfather.
8        Counsel, are there any other documents I should have?
9        MS. MCCLELLAN:  No, Your Honor.
10       MR. LEE:  No, Your Honor.   04:46:20
11       THE COURT:  All right.  Let me summarize the terms of
12   the plea agreement.  It stipulates that the defendant will
13   receive a sentence no higher than the high end of the advisory
14   sentencing guideline range.  There are no other agreements
15   regarding sentencing.  The defendant will receive a three-level   04:46:37
16   downward adjustment for acceptance of responsibility.  The
17   government agrees not to prosecute the defendant for any other
18   violation in relation to the information contained in the
19   discovery.
20       Counsel, have I correctly summarized the plea   04:46:53
21   agreement?
22       MS. MCCLELLAN:  Yes, Your Honor.
23       MR. LEE:  Yes, Your Honor.
24       THE COURT:  All right.
25       When determining the sentence to be imposed today, I   04:46:59

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1   will consider the factors specified in Title 18, United States                04:47:02

2   Code, Section 3553(a), including the sentencing guidelines and

3   any applicable policy statements published by the U.S.

4   Sentencing Commission and I must impose a reasonable sentence.

5           I'm not compelled to impose a sentence to the range                   04:47:18

6   determined by application of the sentencing guidelines.  The

7   guidelines do not establish a presumption of what the sentence

8   should be or of what is a reasonable sentence, nor is the

9   sentence outside the sentencing guidelines presumed to be an

10  unreasonable sentence.                                                        04:47:35

11          The sentencing guidelines are given no more nor less

12  weight than any other statutory factors.  In imposing a

13  sentence, the Court will make an individualized determination

14  based on the facts of this case.  However, I must impose a

15  sentence within the terms of the plea agreement unless I reject  04:47:48

16  the plea agreement.

17          Would both counsel confirm that they and the

18  defendant have received the presentence report and the

19  addendum?

20          MS. MCCLELLAN:  We have, Your Honor.                                  04:47:59

21          MR. LEE:  Yes, Your Honor.

22          THE COURT:  Ms. McClellan, would you confirm that you

23  and your client have read and discussed the presentence report

24  and the addendum?

25          MS. MCCLELLAN:  We have, Your Honor.                                  04:48:05

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1       THE COURT:  All right.                                    04:48:06

2       Now we have the objection to the four-level

3  enhancement.  You all have presented a lot on this.  Let me

4  present some initial thoughts and then I want to hear from both

5  counsel whatever they would like to say.                       04:48:25

6       Without diminishing the reliability of the

7  defendant's wife as a narrator of events, my initial take on

8  this is that this threat is not sufficiently proved and intent

9  to commit for the crime is not sufficiently proved, largely for

10 the reason Ms. McClellan states.  And it's not that I have a    04:49:07

11 firm resolve one way or the other but that I do need to have a

12 clear resolve in favor of the enhancement in order to apply it.

13      So with those thoughts, maybe I should hear from

14 Mr. Lee.

15      MR. LEE:  Certainly, Your Honor.  You have the             04:49:28

16 material before you, Your Honor.  I'm just going to hit a few

17 points that I think have come up since then with the reply and

18 the like and then, hopefully, to address a little bit of what

19 the court indicates by being sufficiently proved.

20      Section 6A1.3 of the guidelines indicates that the         04:49:48

21 Court should take in any information presented without regard

22 to admissibility of the rules of evidence provided that

23 information has sufficient indicia of reliability to support

24 the probable accuracy.

25      The only thing that Ms. Warner, Cami Lee Warner,           04:50:01

United States District Court

1   added to the particular situation, Your Honor, was she provided      04:50:05

2   a list of websites that she asserted that the defendant had

3   been looking at just prior to his absconding.  She also

4   provided the letter itself, and the defendant is not

5   challenging the letter itself.  He's only challenging what he      04:50:22

6   meant by what he wrote in it.

7           We would ask the Court to consider the fact that the

8   websites that we have cited to the Court, the two websites that

9   we have, they have the defendant's photos in them, photo of his

10  daughter.  One is a copy of the federal lawsuit and they all      04:50:42

11  fall in line with his admitted behavior and beliefs, racist

12  prison gang.

13          The defendant in one of the websites indicated he was

14  proud to state that he was true racial Odinist and was putting

15  the finishing touches on a book entitled <u>Odinism:  The</u>      04:50:59

16  <u>Empirical Tradition</u> and that it will be unlike any other way

17  but our Aryan life.

18          He pens this letter days after he absconds saying

19  he's going to go kill Jews and Blacks.  And this coincides with

20  this Web searches, homemade firearms, homemade silencers,      04:51:29

21  information about Abraham Foxman, the leader of the

22  Antidefamation League, including one Web search of, quote,

23  where does Abe Foxman live.

24          We would indicate to the Court as to whatever weight

25  it wants to give to those Web searches because it's truly the      04:51:44

United States District Court

1    greatest information that Miss Cami Lee Warner provided that's    04:51:47

2    in dispute.  It does fall in line with what the defendant has

3    stated about himself, being a racialist, and the materials that

4    have been provided through the presentence report.

5          It's very similar to the binders that were found in    04:52:02

6    his car that talked about civil rights leaders, information

7    from them as well as on how to make homemade bombs.  And so

8    because of that, we believe that the defendant, when he

9    obtained a weapon and was moving forward, that he intended to

10    do what he stated he was going to do.    04:52:23

11          The defendant indicates that somehow his religious

12    beliefs are protected by the First Amendment and we're not

13    discriminating him on his beliefs by any stretch of the

14    imagination, but it does inform the Court about his history and

15    characteristics and provides content, the nature and    04:52:38

16    circumstances of not only the instant offense but what he

17    intended to do.  Defendant indicates that, quote, it's highly

18    speculative what the defendant meant by the term Valhalla.  So

19    he's speaking about himself in the third person here.  But,

20    again, we pull that right of the Encyclopedia Britannica, that    04:52:54

21    it goes with his belief in his hope of starting that, quote

22    unquote, clean path, that clean break on a new path, hopefully,

23    leading to Valhalla, that he was going to head down south to

24    kill some Niggers and Jews until the government gets me.

25    Hopefully, I'll get enough make it all worthwhile before I go.    04:53:17

1   I was never meant to have anything good or pure in this life,     04:53:19

2   so I need to end it, instruct her to get a life insurance

3   policy so she can, quote, collect on it.  And then finishing

4   with that old more saying of believing that -- discusses that

5   believing in one's own strength, his own strength and desire to   04:53:34

6   do this.

7           The defendant has a bachelor's degree in English.

8   When he penned this, he knew what it meant.  He knew what it

9   meant for himself both substantively as well as what it would

10  mean to the objective viewer.                                     04:53:45

11          His story that this letter and acquiring a firearm

12  and absconding was simply as a ruse to get away from his wife,

13  to throw her off his tracks and to protect himself against SAW,

14  the Silent Aryan Warrior prison gang in Utah.  It just doesn't

15  add up, Your Honor.  It's not even close.                         04:54:11

16          Moreover, he says that he wants to somehow go live

17  off the land in Montana.

18          THE COURT:  If that's the direction -- well, I

19  suppose northern Arizona.  He didn't go south.

20          MR. LEE:  Well, he didn't head down to the south or       04:54:24

21  southern states; but where his actual directions were, he was

22  heading, we don't know at this juncture.  He made one -- he

23  bee-lined over to Arizona at some point in time here and this

24  is where we caught him.  But the idea that he had acquired this

25  weapon to live off the land -- a nine millimeter is a small       04:54:40

CR-12-08014-PHX-NVW, August 10, 2012

1  caliber handgun, Your Honor.                                    04:54:45

2          THE COURT:  I don't have to believe any of that, but

3  the question I think is whether this crime, possessing the

4  firearm, was in connection with another felony offense within

5  the meaning of the guidelines.                                  04:55:03

6          And doesn't that come down largely to whether he

7  persuasively had an intention to kill -- well, to kill someone

8  for which -- I mean, obviously possessing the firearm would aid

9  that if he had such an intention.  But a lot of this -- he said

10 a lot of things and he thought a lot of things.                 04:55:33

11         MR. LEE:  Yes, Your Honor, and you've hit the nail on

12 the head.  By a preponderance of the evidence, we need to

13 demonstrate this defendant had formed a firm intent to commit,

14 to have a shootout with the police or to kill these other

15 people or to shoot at them and to hurt them.  And we think that 04:55:45

16 the choice of weapon that he chose, he didn't choose a hunting

17 rifle to live off the land in Montana.  He didn't choose a

18 shotgun to shoot birds.  He picked a nine millimeter pistol,

19 clearly an item that is not suited for that type of thing.

20         He's shot a person before.  It's in his past.  He       04:56:04

21 knows what that can do and he knows what type of weapon to

22 utilize for that.

23         Again, it just makes no sense that if he is -- as we

24 stated in our report, if -- I'm sorry, in our motion, if he was

25 having problems with his wife, he could have moved out.  If he  04:56:25

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1   was having problems with SAW, even if it could be verified, if          04:56:28
2   he's having with them, he could have still left.  It would have
3   been better, obviously, to contact his probation officer, talk
4   to police.  He could have done all of those things.

5          But to acquire weapon and abscond from the state and          04:56:42
6   then pen this letter, this is a person that showed the intent
7   that wanted not just -- he wanted to go out with a bang; that
8   this was going to bring on the full force of law enforcement,
9   not just a few warrants to be picked up on a traffic stop
10  somewhere, but he wanted people to be looking for him.          04:57:00

11         Again, we truly believe the only mistake that he made
12  was that he didn't take the handgun with him in to the
13  McDonald's.  The cases cited by the defendant, they are just
14  not even close.  And the *Jimison* case, we have just some vague
15  statement that was hard for someone to remember.          04:57:21

16         THE COURT:  They all have factual differences.

17         MR. LEE:  They don't.

18         And even in *Ellis*, at least that guy had a hunting
19  rifle which, again, no statements and there's no ammunition for
20  it and no statements to back it up.          04:57:32

21         In this case, Your Honor, you have his written
22  document, an educated man, as to what his intent was to do, the
23  firearm he acquired and his history, which shows that he knows
24  how to utilize it, has done it in the past, and that that is
25  part of his belief system.  So that's why we would assert that          04:57:49

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1    the four-level enhancement is accurate for this defendant.          04:57:53

2              THE COURT:  All right.

3         Ms. McClellan?

4              MS. MCCLELLAN:  Your Honor, we believe, of course,

5    that this is not a sufficient proof that he had any kind of    04:58:01

6    firm intent to commit another felony.  He made a statement in a

7    letter that he penned when he was intoxicated.  He was clearly

8    grieved at the time he wrote the letter.  And if you read the

9    entire letter -- I mean, the whole emphasis of the letter is

10   mainly on the relationship with Cami and how that was falling   04:58:23

11   apart.  It's not a specific threat.  It's this big generalized

12   threat that sounds like braggadocio, like mentioned in some of

13   the cases.  It doesn't -- it's not very specific at all about

14   who he's going to kill, when he's going to kill them, where

15   he's going.                                                      04:58:44

16             So all we have is this vague threat that he makes in

17   this letter.

18             If you look at his actions, he doesn't do anything to

19   follow through with that.  We actually do have proof that he

20   went to Seattle because there was items in his vehicle that     04:58:56

21   showed he had been in Seattle in December after he left.

22             So his statement that he drove northwest is

23   consistent with, obviously, going to Seattle and he went to

24   Kingman for the purpose of seeing his stepfather.

25             He has one firearm.  It's a nine millimeter.  That's  04:59:13

United States District Court

1    a very common firearm that is used for self defense, and he        04:59:16
2    stated that the reason he got it was because he had this
3    paranoid fear that the SAW was coming after him.  He didn't
4    make very good choices.  He hasn't made very good choices
5    throughout his life, but that doesn't prove that he had this        04:59:32
6    intent to commit these vague acts.

7           The government wants to rely on his affiliation with
8    the gang, his religious beliefs; and my point is simply that
9    you can't, based on those, make his intent more firm.  That
10   because he's had beliefs like that that -- so that when he says      04:59:53
11   that, somehow it means something more.  We don't believe that
12   he had made any kind of firm statement here that he was going
13   to commit a crime.

14          The cases that I've cited are not exactly on point.
15   It's hard to find a case that is exactly on point and the           05:00:11
16   government has not cited a case that -- to support their
17   proposition.  There were cases.  I was reviewing them before
18   the Court came on the bench.  There's some cases cited in one
19   of those where they distinguish cases where they did find the
20   four-level increase.  And in two of those cases, one, the           05:00:29
21   defendant had a pipe bomb with a timer and said the reason for
22   that was so he would have an alibi, so that clearly sounds like
23   a weapon that is going to be used in a crime.  And then the
24   other case, the defendant had a firearm and had a specific plan
25   to rob a specific pawn shop and they said he had detailed plans     05:00:49

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1   to commit that crime.                                              05:00:53

2          We just don't have that kind of detail here.

3          The only corroborating evidence that the government

4   really has to show that he had made any plan to commit the

5   crimes is the Google searches.  And I would reiterate that    05:01:03

6   those are not reliable.  We don't know if he made those

7   searches, who made those searches.  Those were provided by his

8   wife.  And even if they were his, I don't think it's enough to

9   show that he had a firm plan to commit this crime.

10         So I don't want to repeat everything that I've said    05:01:26

11  in the papers, but we believe that there was no -- the

12  government cannot prove, even by a preponderance of the

13  evidence, that there was a firm intent to commit a specific

14  felony here and, therefore, the enhancement should not be

15  applied.                                                       05:01:44

16         THE COURT:  All right.  The briefing and the

17  arguments from counsel are helpful.  This is a close call,

18  close question.

19         So it comes down to the fact that I am charged with

20  making my own judgment of what is persuasive and how persuasive  05:02:01

21  it is; and taking seriously the burden of proof by a

22  preponderance of the evidence, there's plenty of evidence here

23  that the defendant made threats.  There's also plenty of

24  evidence that he was extravagant and has many times been, as

25  Dr. Walter notes, suffered serious emotional mental illness.   05:02:31

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1      On balance, I am just not persuaded that even taking          05:02:38

2  all of this that -- including the Internet searches, that he

3  had gotten sufficiently proximate to an actual intent to commit

4  a crime.  Part of the reason it tips the scale, or that the

5  evidence falls short of persuasion, is that if he did have that   05:02:54

6  intent, he had plenty of time to do it and he didn't do it.  He

7  didn't go south.  He went straight west.

8      So although there's evidence that could support a

9  conclusion either way, my degree of persuasion falls short of a

10 preponderance of the evidence.  Therefore, the defendant's        05:03:18

11 objection to paragraph 28, specific offense characteristic, is

12 sustained.  And that results in other changes, paragraph 32,

13 adjusted offense level becomes 20, and paragraph 36, total

14 offense level becomes 17.

15     Are there any other objections to the presentence             05:03:41

16 report?

17          MS. MCCLELLAN:  No, Your Honor.

18          THE COURT:  All right.

19     The defendant has pleaded guilty and the Court has

20 accepted the defendant's guilty plea.  There having been a        05:03:57

21 determination of guilt by virtue of the defendant's guilty

22 plea, it is the judgment of the Court that the defendant is

23 guilty of felon in possession of a firearm and ammunition in

24 violation of Title 18, United States Code, Section 922(g)(1)

25 and 924(a)(2).                                                     05:04:15

CR-12-08014-PHX-NVW, August 10, 2012

1    The Court will accept the plea agreement and the                    05:04:20

2  judgment and sentence will be consistent with it.  I am

3  satisfied that the plea agreement adequately reflects the

4  seriousness of the actual offense behavior and that accepting

5  the agreement will not undermine the statutory purposes of          05:04:32

6  sentencing or the sentencing guidelines, and the stipulated

7  sentence cap is within the applicable guideline range.

8          The Court finds the offense level computations, the

9  total offense and the total offense level are as I have just

10 stated.  The defendant's Criminal History Category is as stated     05:04:50

11 in the presentence investigation report.

12         Now, what are -- let's see, the applicable ranges,

13 the addendum, applicable ranges would be 51 to 63 months with a

14 fine range of $5,000 to $50,000.

15         All right.  I'll hear your allocution first,               05:05:13

16 Ms. McClellan, and the issues, of course, are the sentencing

17 range.  And you've raised this question of whether there should

18 be a term of community confinement recommended by the Court

19 and . . .

20         Yes.  All right.  Please proceed.                          05:06:08

21         MS. MCCLELLAN:  Your Honor, I have suggested to the

22 Court that a variance might be applicable in this case.  In

23 light of the Court's ruling, the extent of the variance may not

24 be what I had contemplated in the motion.  At the time I wrote

25 the motion, I really wasn't sure where he was going to end up      05:06:25

CR-12-08014-PHX-NVW, August 10, 2012

1   on the guideline range, so that was one of my concerns, but all      05:06:27
2   of the issues that I raise are very relevant to what the
3   sentence should be, whether it's within the range or below the
4   range.

5          The defendant has talked to me at length about the          05:06:39
6   significant abuse that he suffered as a child.  It was
7   something we tried to find some information on.  It just
8   really -- we could not find it.  When things are that old and
9   juvenile records, it's very difficult to find.  We have no
10  reason to believe that he's not being truthful in his            05:06:56
11  descriptions of his childhood.  It just was an extremely
12  dysfunctional childhood and he started having mental health
13  problems at a very young age.  He was committed to the
14  California Youth Authority at the age of 16.

15         Mr. Warner has great possibilities.  He has a very          05:07:17
16  high IQ, he's very well-written.  He'd educated himself while
17  he's in prison.  He has job skills.  He can work as a
18  machinist.  So he really does have a chance and really what he
19  has to change is his social skills, is his ability to adapt to
20  a world where he has to work for a living and have               05:07:35
21  responsibilities and it's something he just hasn't had the
22  opportunity to do.

23         Now, that's primarily his fault, of course, because
24  of all of the crimes that he's committed and the time that he
25  spent in custody.                                                05:07:48

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1     But the problem is the longer he serves in prison          05:07:52

2  again, the more his way of looking at life is going to remain

3  the same and he's not going to have the opportunity for

4  rehabilitation which he does need.

5     The amount of rehabilitation that he will receive in     05:08:10

6  prison is probably minimal.  He's not going to get counseling

7  in the sense of to deal with, you know, childhood issues or

8  depression.  They will prescribe medications to persons.  You

9  can do anger management classes, parenting classes, but they

10  really don't have one-on-one counseling.  That is something    05:08:26

11  that he will have to take advantage of when he's released from

12  prison.

13     So that's one reason we suggested a variance and also

14  that a longer term of community corrections would be helpful.

15  The Bureau of Prisons is really not implementing the 12-month  05:08:48

16  term of community corrections, at least not at this time is my

17  understanding.  However, it is possible they might do that in

18  the future and I did do research on it that showed if there is

19  a recommendation in the judgment, the defendant is somewhat

20  more likely to get into a program like that.  It's no guarantee 05:09:08

21  that he will be released early to a community correction

22  center.  It just makes it more likely, just like participating

23  in the residential drug and alcohol abuse program.

24     So we would ask that the Court take those things into

25  consideration.  I know that Mr. Warner really does want to make 05:09:26

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

| | | |
|---|---|---|
| 1 | a life for himself outside of prison, that he's gotten old | 05:09:30 |
| 2 | enough now that he realizes this is a cycle that has to end at | |
| 3 | some point in his life.  He's sorry for what he did and he | |
| 4 | knows he made really poor choices and that if he had just | |
| 5 | talked to someone about what was going on, he wouldn't be where | 05:09:47 |
| 6 | he is today.  He, of course, repeatedly told me he had no | |
| 7 | intention of harming anyone when he was -- after he absconded. | |
| 8 | I don't think he really had a very good plan about what to do | |
| 9 | with his life, but part of his plan was not to go to harm | |
| 10 | people. | 05:10:05 |
| 11 | So we would ask that the Court consider some kind of | |
| 12 | variance or at least a sentence at the low end and recommend | |
| 13 | the longer term of community corrections.  Thank you. | |
| 14 | THE COURT:  All right.  Mr. Warner, is there anything | |
| 15 | that you would like to say to the Court before sentencing?  You | 05:10:18 |
| 16 | don't have to say anything but you are welcome to say anything | |
| 17 | that you would like. | |
| 18 | THE DEFENDANT:  I did prepare a letter for you, Your | |
| 19 | Honor.  Some of it may not be appropriate after you've already | |
| 20 | ruled on it; but if you don't mind, I'll read it all anyway. | 05:10:29 |
| 21 | THE COURT:  All right. | |
| 22 | THE DEFENDANT:  Much is to be made about what I | |
| 23 | intended to do when I left Wisconsin, more specifically, with | |
| 24 | the purchase of the firearm I had in my possession. | |
| 25 | The facts are that I did not commit any crime aside | 05:10:43 |

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1  from having the gun itself and, quite frankly, never had any          05:10:45

2  intention whatsoever to do so.

3          My sole consideration was how best to protect myself

4  from a genuine and verified threat and later where to go from

5  that point.  Ultimately, I decided to get an RV and go to          05:10:55

6  Montana as it seemed to solve the problem of everybody looking

7  for me.

8          Before I had even been booked into jail, my dad told

9  the FBI --

10          THE COURT:  Would you slow down a little bit, please?          05:11:08

11          THE DEFENDANT:  Yes, sir.

12          Before I had even been booked into jail, my dad told

13  the FBI what I had intended to do and that I had the gun only

14  for protection from a gang.  This clearly demonstrates exactly

15  what my firm intent was, to go to Montana and live off the land          05:11:21

16  and nothing more.  In fact, the FBI contacted a number of

17  people from my phone and all of them stated that I was

18  incapable of senseless violence.

19          Which leads me to my primary concern.  I am a former

20  gang member, a fact that the presentence report and the          05:11:39

21  prosecutor failed to acknowledge, despite it being well-known

22  to all of the STG I've dealt with in both Utah, where the gang

23  is based, and in Arizona.  It is an unfortunate part of prison

24  that joining a gang for protection becomes a virtual necessity

25  for most who do not want to be preyed upon even when the          05:11:52

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1    ideology of that gang is reprehensible.                              05:11:56

2              I was a skinny kid when I entered prison for the

3    first time and terrified of being raped.  The reality is that

4    joining a prison gang is more often about survival and

5    identifying with the gang -- and identifying with the gang and   05:12:14

6    that is the only reason I became a member, although I had never

7    embraced the gang's racist beliefs, I was well-versed enough in

8    the rhetoric and symbols to convince people I was a racist.

9              I'm sorry, Your Honor.

10             THE COURT:  Just take your time.                         05:12:34

11             THE DEFENDANT:  About three years ago I began to

12   pursue my genealogy and I discovered that I was half Native

13   American.  My grandmother has been -- was born on a Broken

14   Arrow reservation in Oklahoma and this provided the catalyst

15   and courage to leave the gang -- this provided the catalyst and  05:12:59

16   courage to leave the gang but would also put my life in

17   jeopardy.

18             I was forthright with the FBI from the very

19   beginning.  I told them I had a gun in my truck, gave them

20   consent to search my vehicle, and explained exactly why I had    05:13:30

21   it, as protection from a prison gang, the one I left.

22             These are the facts and I had no other intentions for

23   the gun but as protection.  This is why I am so upset right

24   here, Your Honor.  I do feel it necessary to expand upon what

25   was mentioned in the presentence report about my childhood.      05:13:55

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1    My earliest childhood memory of consists of getting    05:14:10

2  beaten by my mother's boyfriend at the time for nothing more

3  than being witness to him being wrapped to a chair by his boa

4  constrictor.  Police and ambulances -- police and ambulances

5  had to be called to free him, and it somehow offended his    05:14:25

6  manhood that I had seen him there like this.  So he beat me for

7  it.  I was four years old.

8    I'm sorry, Your Honor.  I was four years old at the

9  time.  I also remember being beaten for wetting the bed on

10 several occasions and on my fifth birthday for opening a    05:15:29

11 present before I was supposed to.  These were not mere

12 spankings or even slaps but full beatings with closed fists.

13    On the day my mother married this man, he broke my

14 nose for not getting his beer quick enough.  Later his parents

15 locked me in a dark closet for the next two days without food    05:15:53

16 or water as punishment for what they said was ruining the

17 wedding by bleeding all over the place.  And I remained in this

18 closet for the next two weeks while my mother was on her

19 honeymoon.

20    Not long after this, my mother took a trip to Canada    05:16:09

21 to visit her friend and left me with Ray.  On Friday night, he

22 wanted to go to the bar, as he had done every other weekend,

23 but obviously could not bring a child.  Instead of getting a

24 baby-sitter, like a normal person, he handcuffed me to my bed

25 where I remained until Sunday evening when he finally came    05:16:35

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1  home, at which point he proceeded to uncuff me, beat me for          05:16:38

2  defecating on myself and crying, locked me out of the house and

3  passed out.

4          We lived in the desert at the time.  Our nearest

5  neighbor was more than a mile away and I almost died that          05:16:57

6  night.

7          These are just a few of the incidents I remember from

8  my childhood and none of it was ever good.  Many others I could

9  describe are as bad or worse.  Being placed in a mental

10  hospital when I was eight for ADHD and being what they called          05:17:18

11  incorrigible was actually a relief for me as I had escaped

12  Ray's abuse although I had nightmares for many years, and still

13  get panics attacks when I am being threatened with physical

14  violence.

15          My worst memory, however, came a year or so later          05:17:35

16  when I was nine, almost ten.  I was visiting my mother, who was

17  finally separated from Ray at the time when he literally broke

18  into the house.  He grabbed my baby brother out of his crib,

19  his own son, who was only a few months old, and he put a gun to

20  his head threatening to kill him if my mother didn't take him          05:17:58

21  back.

22          He likewise pointed the gun at me several times and

23  to this day, this scene is as vivid in my mind as if it had

24  just occurred.  And each time I see it, I'm transported back to

25  that helpless little boy.          05:18:21

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1        And I am not offering any of this for sympathy nor to  05:18:34

2   justify anything I have done since then as it is absurd to

3   blame another for one's own decisions.  I don't excuse my

4   behavior because I realize on a rational level that there came

5   a point in my life when I became responsible for my actions  05:18:50

6   although, admittedly at times, the choices I made are based on

7   logic I can't even seem to comprehend.

8        I think it is imperative that I learn to understand

9   this better.  These examples are merely meant to serve as a

10  foundation for understanding what has led me to the point I am  05:19:10

11  at today where I stand before you to be judged.

12       Growing up as I did with the extent of physical and

13  emotional abuse and early mental health issues left unresolved

14  desensitized me in many ways to what is prevalent for most

15  people; namely, normal interpersonal relationships and  05:19:32

16  appropriately conditioned responses to stimuli.  I know this

17  from the therapy I received to date and I even learned to

18  forgive Ray for what he did to me, but it has taken me a long

19  time to fully apprehend the impact that it has had on my life.

20  And I'm not sure I actually appreciate the extent of it even  05:19:49

21  today, but I'm trying.

22       The first lesson I learned in life was to survive by

23  any means possible rather than being a healthy instinct or an

24  impetus to pursue success as it is for most people, in me it

25  evolved into the worst kind of selfishness, a sense of get  05:20:10

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1  whatever you can, however you have to, as nobody else going to        05:20:14

2  help you, and to protect yourself at all costs.

3          I have literally taken care of myself since I was 13,

4  and it can be argued long before that as I somehow survived

5  Ray's abuse as a child.  So my independence has been, in large       05:20:29

6  part, based on this selfish attitude and I strive each and

7  every day to develop a different perspective.

8          On an intellectual level, I would like to believe I

9  know the difference between right and wrong.  However, I have

10 come to realize that while most people see it as absolute black      05:20:46

11 and white terms, I seem to have an abstract gray area where

12 some things seem okay, dependent on an arbitrary logic.  This

13 offense is a prime example.  On the one hand, I know I'm not

14 supposed to possess a gun as I am a felon; on the other, the

15 Constitution states that as a citizen, I have a right to bear        05:21:06

16 arms, which provides myself justification.

17         But, more importantly, my life experiences have

18 taught me that I am the only one who will take care of me, this

19 latter overriding any reservations that remain regarding

20 getting a gun to protect myself.                                     05:21:20

21         So this impulse serves to guide my decision.

22 Obviously, I now know beyond a doubt that this was a bad

23 choice, and I will not make the same one in the future, nor

24 will I ever possess a weapon of any sort again.

25         I've often heard it said that hindsight is 20/20 but        05:21:35

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1  I am striving to make good decisions based upon the here and          05:21:38

2  now, not reflect back on what I should have done.

3          And although this may not be evident to many, I am

4  actually successful in this regard most of the time.  I believe

5  I would benefit from working with a therapist to deal with the        05:21:49

6  other times, those that I struggle with.

7          My short-term goals at the moment are to get out,

8  move closer to my father, the only person that has ever been a

9  true positive influence on me and offered good advice, and

10  start building a normal life.  I want to see a therapist at          05:22:05

11  least once a week although, hopefully, more frequently if I can

12  afford it, attend any programming offered by probation that

13  would benefit me and help me cope with re-integrating into

14  society and begin going to Alcoholics Anonymous twice a week.

15          My aunt is an inspiration for this last as she has          05:22:24

16  been attending AA for over 30 years and has been sober for over

17  30 years.  AA offers me a way to deal with addiction in a

18  structured manner and allows me to develop interpersonal

19  relationships through its sponsorship program.  I also hope to

20  gain employment as a machinist.                                      05:22:40

21          My long-term goals are to successfully complete

22  supervision, build a career as a machinist, and start a family.

23  These are all reasonable goals and well within my grasp so long

24  as I remain focused on them as guiding principles for my life.

25          It seems to me that there is a precarious balance          05:22:54

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1    regarding sentencing in our country.  On the one hand, society    05:23:02

2    demands punishment and protection from criminals, concerns I

3    completely understand and agree with as there must be

4    consequences for breaking the law.

5           On the other hand, if there is no rehabilitation,    05:23:13

6    then most will have a hard time reintegrating into society upon

7    their release and return, instead, to old habits.

8    Incarceration alone is not rehabilitating.  There are few

9    prisons today that offer real effective programming that

10   present offenders the necessary tools for success.    05:23:29

11          I am somewhat unique in that I am educated and do not

12   use drugs, two problems that many have, yet I have a whole set

13   of issues all my own and the question then becomes can

14   incarceration help me or is it merely punishment?

15          Dr. Walter states in his report that I have, quote,    05:23:44

16   spent -- simply spent too much time in prison, end quote; and

17   if I am to succeed outside of prison, I will need much more

18   structure and mandated mental health treatment, an analysis I

19   agree with.

20          Some of Dr. Walter's report was difficult for me to    05:24:02

21   digest.  I don't think anyone enjoys having their most glaring

22   faults and flaws pointed out in such black-and-white terms.

23   And for me, it seems to go deeper than even I was aware of.

24          I have always struggled with impulse control and this

25   is something I work on every day.    05:24:18

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1    And I become better at managing although I know there          05:24:21

2  are still a ways to go before I have full control.   I

3  understand the concept of an addictive personality and continue

4  to try to break bad habits.   The other issues, however, I think

5  will require therapy for me to fully comprehend and deal with    05:24:34

6  as I have a difficult time recognizing any type of personality

7  or mood disorder, and separating paranoia from a true threat is

8  tough at times.   Medications I am on definitely help.   I

9  believe they need to be in conjunction with therapy to be

10  effective.                                                      05:24:50

11    With all of this in mind, I would ask that you

12  consider this, Your Honor:   While I think Ms. McClellan

13  overreached a little in her desire to get the best for me, her

14  reasoning is sound and I likewise think what she has asked for

15  from the Court was in my best interest and represents a path    05:25:04

16  that could lead to the greatest success.   Similarly, Dr.

17  Walter's rationale is reasonable and apropos to the current

18  situation.   A lengthy incarceration is likely to exacerbate my

19  condition whereas what I need is structure and therapy,

20  something I look forward to.                                    05:25:18

21    Even the sentencing recommendation offered by the

22  probation office makes it evident that I have spent too much

23  time in prison and will, quote, likely benefit from having --

24  from learning interpersonal skills and cognitive behavioral

25  treatment, end quote.                                           05:25:33

United States District Court

1        In fact, it was recommended that one of my conditions      05:25:34

2   upon release will be that I participate in a mental health

3   program as directed by the probation officer which may include

4   taking prescription medications.  So it would appear that we

5   are all in agreement that therapy is of paramount importance,   05:25:45

6   that I have spent too much of my life incarcerated already and

7   I would thus implore the Court for a sentence consistent with

8   placing me in a structured environment that will allow me to

9   develop interpersonal skills, gain employment, build social

10  relationships, and attend therapy.                              05:26:01

11       I am not a perfect man but I am a good one and all I

12  ask is an opportunity to demonstrate that.  Thank you.

13       THE COURT:  All right.

14       Mr. Lee?

15       MR. LEE:  Your Honor, we received a little bit ago         05:26:13

16  the letter from Roger Potter and on the last page of that

17  letter it states, the second sentence in, it's the first full

18  sentence, it says:  The way he looks on paper is not who he

19  really is.  We've just seen a great example of that here, Your

20  Honor, but not in the way I think the defendant intended.       05:26:36

21       If you look at the information that we cited from

22  the -- from defendant's lawsuit, it indicated, when providing a

23  history of the defendant in the Utah prisons, that he had had a

24  brief stint on parole for three months at that time, back in

25  2007, and he blew that.  And now we have him again on parole    05:26:56

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1    and he blew that.                                           05:27:00

2          And the defendant states that he needs more

3    psychological counseling and help, and we don't doubt that that

4    is correct; but as the PSR states, clearly, in paragraph 65 and

5    66, that he received psychological counseling while in prison   05:27:11

6    and while on parole in Wisconsin.  He had people or a person to

7    talk to in Wisconsin about this before he took off.

8          The most surprising thing the defendant has just said

9    is that he is not looking for sympathy for the statements he's

10   provided.  We are not going to sit here and contest the       05:27:32

11   government about what his childhood is or was.  We have no

12   information to help document that one way or the other.

13         But it sounds like it was horrible one way or the

14   other.  Our problem, the government's problem, with this is

15   that he -- in telling this court that he joined SAW for       05:27:46

16   protection and that he had to convince people that he was

17   racist was not for sympathetic purposes is outlandish.

18         We would like to turn the Court's attention to

19   Exhibit 1 that the government put in its sentencing motion.

20   The defendant was interviewed shortly after his arrest by     05:28:05

21   detectives from the Lake Havasu City Police Department who were

22   there for the purpose of filling out a gang member

23   identification criteria sheet.

24         Quote, once at the jail, I spoke with Warner about

25   his membership in the Silent Aryan Warriors.  Warner said he   05:28:28

United States District Court

1  went to prison in 1998 for shooting a man.  He said he was in       05:28:33

2  prison four years before he began associating the Silent Aryan

3  Warriors.  He said the moniker for Silent Aryan Warriors is

4  S-A-W and that SAW was a white prison gang.  He said a friend

5  and him in prison was a member of the Silent Aryan Warriors and    05:28:51

6  talked him into joining.  He said he had to put in work, quote

7  unquote, for the Silent Aryan Warriors, to join.  Warner said

8  the work, quote unquote, that someone might have to do included

9  assaults and stabbings.  He said the assaults or stabbings

10  could be ordered because someone was owing debts, either money    05:29:12

11  or drugs, or for someone being disrespectful.  And this is the

12  one point we really want to get across to the Court.

13         Quote, Warner said he joined the Silent Aryan

14  Warriors because he thought -- he said he thought SAW was about

15  promoting the white race.  And then as it goes on, he became     05:29:31

16  more disaffected when he found it was simply a dope gang, not a

17  gang about promoting the white race.

18         He also states in this he talks about his tattoos.

19  He has numerous tattoos and, again, he says, quote, I put in

20  work and earned, unquote, all his tattoos.                        05:29:51

21         We heard about defendant's plans for the future.  We

22  heard statements from an educated man and we have not heard

23  once other than to say he had to, quote unquote, convince

24  people he wasn't a racist, that somehow he has put all of that

25  aside.                                                            05:30:13

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1        It's absolutely amazing for this defendant to come up        05:30:16

2   here and make statements to the court like this; that he simply

3   joined them for protection, put all of these tattoos on.  And

4   you have all of the photographs, Your Honor, not only showing

5   the racist tattoos, but the "Heil Hitlers" and the sites that   05:30:27

6   he goes on to, to the claim that that's not part of his

7   ideology and he just did it for protection.

8        There is no reason for a downward variance here.  The

9   defendant's history with weapons is as follows:  PSR paragraph

10  38, a large knife and a hidden pocket comb knife during a       05:30:46

11  burglary.

12       PSR paragraph 39, shooting a man resulting in his

13  permanent disability.  PSR paragraph 40, a dismissed charge for

14  possession of a deadly weapon, switchblade, in exchange for

15  pleading guilty to other charges.                               05:31:02

16       PSR paragraph 42, possession of a knife in prison;

17  PSR paragraph 39, a 2007 arrest for allegedly pointing a .40

18  caliber handgun at a person; PSR paragraph 7, pointing a

19  handgun at his neighbor just before absconding in the instant

20  case; and then last, but not least, PSR paragraph 19.  And as   05:31:22

21  has been spoken of here in this report on gang membership,

22  unknown utilization of various weapons to put in work for SAW

23  via assaults and stabbings where he gained the gang moniker

24  Tombstone.

25       The law and its punishments have had no deterrent          05:31:42

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1    effect on this defendant possessing weapons and utilizing them          05:31:45
2    both outside of prison as well as inside the structured
3    environment.

4              As such, we would ask this Court to deny his request
5    for downward variance.  He should receive the maximum sentence          05:31:57
6    possible, which is at the high end per the plea agreement,
7    which now has been adjusted for 61 months.  He needs that
8    structure, with the greatest amount of supervised release that
9    this Court can impose to make it so that, hopefully, as he has
10   stated his intentions to clean up his life which, based on his          05:32:15
11   statements that we've just heard now, the government has
12   serious doubts as to the accuracy thereof that this occur.

13             We further ask the Court to make sure, or to order in
14   its order, based on *Setzer v. United States*, that the
15   defendant's sentence federally here run consecutive to any             05:32:34
16   remaining sentence he may have in Utah on his parole.

17             THE COURT:  Was that remaining sentence already
18   imposed or in anticipation of some new sentence?

19             MS. MCCLELLAN:  It's the anticipation of a new
20   sentence.                                                              05:32:49

21             THE COURT:  That's what I thought from your brief.

22             MR. LEE:  Your Honor, I'm sorry.  I just don't know
23   how to answer that because --

24             THE COURT:  That's easy for me.  I am not in a
25   position to -- if there's a new sentence from a judge in Utah          05:33:00

United States District Court

1    or anywhere, I don't know what that judge will know and it          05:33:03

2    is -- the only fair and wise way to leave it is to leave it to

3    that future judge to determine whether his sentence should be

4    concurrent or consecutive to the sentence this Court imposes.

5              MR. LEE:  Thank you, Your Honor.                          05:33:19

6              THE COURT:  All right.

7              Considering the statutory purposes of sentencing

8    versus the and nature and circumstances of the offense, which

9    is closely related to the history and characteristics of the

10   offense, and this is felon in possession of a firearm, in          05:33:34

11   circumstances which, even though I have found that I'm not

12   persuaded that he had a specific intention to commit a violent

13   crime with that, had his communications and threats made this

14   situation one of utmost gravity for the protection of the

15   community and for law enforcement far more serious than most of    05:34:03

16   the felon in possession cases I see.

17             Another factor is the need for the sentence to

18   reflect the seriousness of the offense, to promote respect for

19   the law and to provide just punishment.  And that's closely

20   related to what I just said.  Another is the need to afford        05:34:29

21   adequate deterrence.

22             It's difficult for the Court to say to protect,

23   Mr. Warner, whether you will be deterred or whether your

24   comments here today reflect a new -- a change of insight and

25   values.  We all hope that what you've said here does reflect a     05:34:55

34

CR-12-08014-PHX-NVW, August 10, 2012

1    deep change.                                                    05:34:59

2           And I don't -- I conclude I don't have to decide

3    that, whether what you're saying here today is sincere.  It

4    sounds sincere to me, or whether it is a ruse.  I want to

5    believe it and I take it as a true statement of your new       05:35:16

6    awareness and intentions and plans for your life.

7           Nevertheless, in the circumstances of this case, I am

8    persuaded that a sentence of 63 months is appropriate, the

9    minimum amount to serve the statutory purposes of sentencing.

10          In light of the defendant's extended history of         05:35:38

11   violence and threat of violence, to possess a firearm at all is

12   a serious offense; but in the circumstances of communicating

13   threats, a connection with it is -- the highest level of

14   seriousness and threat to the community, short of a present

15   intention to commit another crime, to which I am not persuaded. 05:36:12

16          I give great weight, Mr. Warner, to your background,

17   troubled childhood -- troubled is a great understatement -- and

18   Dr. Walter's review and assessment.  But you're still very

19   dangerous, very dangerous unless and until you, in fact, have

20   achieved the rehabilitation, the change of attitude and changed 05:36:50

21   insight about values and other people and indeed what to do

22   with your own life.  I am not persuaded that I can or should

23   disregard all of those other factors in the hope -- and more

24   than a hope, good reason to believe that you are headed toward

25   this profound change.                                           05:37:15

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1    Another factor mentions the need to afford adequate          05:37:19
2  deterrence and a second part of that is the need to deter
3  others to provide a punishment that communicates to other
4  people similarly situated that conduct, similar conduct, will
5  have an appropriate consequence, enough to persuade people not  05:37:34
6  to pursue that conduct; not just to persuade you but to
7  persuade other people.

8    I do agree completely with Dr. Walter that you are
9  very much in need of additional treatment and structure.  You
10  had all of that.  You had that while you were in prison.  You   05:37:55
11  had that available to you when you were released and within
12  three months you committed this new crime in extremely serious
13  circumstances.

14    Ms. McClellan, I will make this recommendation
15  although you're telling me it's not being implemented.  I am    05:38:13
16  persuaded that if they would do that, this community detention
17  up to 12 months, I will recommend it.  In the end, they would
18  have to make the decision whether it's appropriate if they are
19  implementing it.  But I do want to recommend it so that they
20  give it great consideration.                                    05:38:36

21    Another factor I want to touch on is the need to
22  avoid unwarranted sentence disparities among defendants with
23  similar records who have been found guilty of similar conduct.
24  This is not a hard scientific comparison but this is one of the
25  most serious felon in possession of a firearm cases that I've   05:38:55

United States District Court

1    seen in my time on the Court in terms of the history and the          05:38:58

2    circumstances.

3             MS. MCCLELLAN:  Your Honor, may I raise one issue?

4             THE COURT:  Yes.

5             MS. MCCLELLAN:  If you are making the recommendation          05:39:12

6    of the 12 months at the community correction center, we would

7    ask that you not impose the condition that he reside at the

8    residential re-entry center.

9             THE COURT:  Well, the problem is, I do want that if

10   he doesn't get the -- this basically unutilized community             05:39:27

11   corrections.

12            I'm just going to state it that way.  So I -- and

13   indeed if anything, this transition is more important for him

14   than most people, so I'm not going to take any chance of not

15   having one or the other.  I did think about that but thank you        05:39:56

16   for pointing it out.

17            Pursuant to the Sentencing Reform Act of 1984, it is

18   the judgment of the Court that Danny Lee Warner, Jr., is hereby

19   committed to the Bureau of Prisons for 63 months.  The

20   defendant shall pay a special assessment of $100 which shall be       05:40:08

21   due immediately.  The Court finds the defendant does not have

22   the ability to pay and orders the fine waived.

23            The defendant shall pay a total of $100 in criminal

24   monetary penalties, due immediately.

25            Having assessed the defendant's ability to pay,             05:40:24

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1   payment of the total criminal monetary penalties is due as          05:40:26

2   follows:  Balance is due in equal monthly installments of $25

3   over a period of four months to commence 60 days after release

4   from imprisonment.  If incarcerated, payment of criminal

5   monetary penalties is due during imprisonment at a rate of not      05:40:40

6   less than $25 per quarter, and payment shall be made through

7   the Bureau of Prisons Inmate Financial Responsibility Program.

8   The Court hereby waives the imposition of interest and

9   penalties on any unpaid balance.

10        Upon release from imprisonment, the defendant shall          05:40:58

11  be placed on supervised release for three years.  While on

12  supervised release, the defendant shall comply with the

13  standard conditions of supervision adopted by this Court in

14  general order 12-13.

15        Of particular importance is, you shall not commit           05:41:13

16  another federal, state, or local crime during the term of

17  supervision.  The defendant shall comply with the following

18  additional conditions:  You shall participate in a program

19  aimed at addressing specific interpersonal or social areas, for

20  example, domestic violence, anger management, marital            05:41:34

21  counseling, financial counseling, cognitive skills and

22  parenting.  You shall participate in a mental health program as

23  directed by the probation officer which may include taking

24  prescribed medication.  You shall contribute to the cost of

25  treatment in an amount to be determined by the probation         05:41:50

CR-12-08014-PHX-NVW, August 10, 2012

1  officer.                                                      05:41:53

2          You shall provide all financial documentation

3  requested by the Probation Office.

4          You shall reside and participate in a residential

5  re-entry center for 180 days unless discharged earlier by the   05:42:01

6  probation officer.

7          You shall not be involved with gang activity, possess

8  any gang paraphernalia, or associate with any person affiliated

9  with a gang.  The defendant shall comply with the standard

10  conditions of supervision requiring full-time employment at a   05:42:20

11  lawful occupation.

12          This may include participation in training counseling

13  and/or daily job searching as directed by the probation

14  officer.  If not in compliance with the condition of

15  supervision, the defendant may be required to perform up to 20   05:42:37

16  hours of community service per week until employed as approved

17  or directed by the probation officer.

18          You shall submit your person, property, house,

19  residence, vehicle, papers, computers as defined in Title 18,

20  United States Code, Section 1030(e)(1), other electronic         05:42:55

21  communication or data storage devices or media or office, to a

22  search conducted by a probation officer.  Failure to submit to

23  a search may be grounds for revocation of release.

24          You shall warn any other occupants that the premises

25  may be subject to searches pursuant to this condition.           05:43:17

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1    You are prohibited from owning, maintaining, or using       05:43:22

2    a firearm.  The defendant's interest in the property seized

3    shall be forfeited to the United States.

4    And the Court recommends to the Bureau of Prisons

5    that the defendant be considered for, and allowed to          05:44:02

6    participate in, Community Corrections to the maximum extent

7    available.  And if that is provided, the provision for --

8    participation in a residential re-entry center for 180 days

9    would be omitted, but that is only in the event that the Bureau

10   of Prisons allows him to participate in the Community -- what    05:44:44

11   do we call this again? -- Community Corrections.

12   All right.  The Court finds the sentence -- the Court

13   adopts the facts as set forth in the presentence report in

14   support of the guideline calculations and reason for sentence

15   except as I have stated otherwise in this proceeding.  The      05:45:15

16   Court finds the sentence to be reasonable in light of the facts

17   and the statutory purposes of sentencing and to be sufficient

18   but not greater than necessary to serve the statutory purposes

19   of sentencing.

20   Mr. Warner, do you understand the sentence?                     05:45:30

21   THE DEFENDANT:  Yes, sir.

22   THE COURT:  And would both counsel confirm that the

23   sentence complies with the plea agreement?

24   MS. MCCLELLAN:  It does, Your Honor.

25   MR. LEE:  It does, Your Honor.                                  05:45:38

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1        THE COURT:  I find that the sentence complies with

2   the plea agreement and, therefore, that the defendant has

3   waived his right to appeal the judgment and the sentence.

4   However, Mr. Warner, if you wish to attempt to appeal,

5   notwithstanding your waiver of your right to appeal, you must

6   file a notice of appeal within 14 days of today.  If you

7   request a notice of appeal, it will be prepared for you and

8   filed for you.  If you cannot provide an attorney for yourself,

9   an attorney will be provided for you for purposes of an appeal.

10       Counsel, is there anything I've omitted?

11       MS. MCCLELLAN:  Your Honor, Mr. Warner had one

12   additional request.  He wanted to know if the Court would

13   recommend to the Bureau of Prisons that he be designated to

14   serve his time at FCI Oxford in Wisconsin.  He is aware that

15   they have a machinist program there and he also has family in

16   Wisconsin.

17       THE COURT:  I am going to decline to make that

18   recommendation, not because I don't think it's a good idea, but

19   because the Bureau of Prisons can consider all of those things

20   and any other relevant factors.  I decline it only for that

21   reason.

22       Anything else, Counsel?

23       MR. LEE:  No, Your Honor.  Thank you.

24       MS. MCCLELLAN:  No, Your Honor.  Thank you.

25       THE COURT:  Oh, just a minute.

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

1          Actually, there is no property identified in the plea          05:46:52

2    agreement as to be forfeited?  Is there anything specific we

3    should identify as forfeited.  The firearm.

4          MR. LEE:  Yes, Your Honor, the firearm and the

5    associated ammunition.                                              05:47:02

6          THE COURT:  It's ordered the firearm and the

7    associated ammunition are forfeited to the United States.

8          Thank you.

9          MR. LEE:  Thank you, Your Honor.

10         COURTROOM DEPUTY:  All rise, please.                          05:47:11

11         (Whereupon, these proceedings recessed at 5:47 p.m.)

12                        *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

CR-12-08014-PHX-NVW, August 10, 2012

C E R T I F I C A T E

     I, ELAINE M. CROPPER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

     I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

     DATED at Phoenix, Arizona, this 11th day of October, 2012.


               s/Elaine M. Cropper

               _____
               Elaine M. Cropper, RDR, CRR, CCP


United States District Court